SMITH, Circuit Judge.
The Arkansas General Assembly (“General Assembly”) enacted the Public School Choice Act of 2013 (“2013 Act”).[1] Act 1227, 2013 Ark. Acts 1227 (Apr. 16, 2013), codified at Ark.Code Ann. § 6-18-1901 et seq. The 2013 Act contained a “broad school choice transfer option.” Teague v. Cooper, 720 F.3d 973, 975 (8th Cir.2013). But the 2013 Act also contained limitations. In relevant part, it provided that “[a] school district annually may declare an exemption under this section if the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation.” Ark.Code Ann. § 6 — 18— 1906(b)(1) (2013). The 2013 Act required a school district to “notify the [Arkansas Department of Education] by April 1” if the district intends to declare an exemption “in the next school year.” Id. § 6 — 18— 1906(b)(3). The “exemptions under the 2013 Act are limited to individual school districts that are subject to federal desegregation mandates.” Teague, 720 F.3d at 977 n. 2.
Heath Adkisson, Lori Adkisson, Ryan Braswell, Melissa Braswell, Oliver Coppedge, Tracy Coppedge, George A. Hale III, Stephanie Hale, Jeff Langston, and Missy Langston (collectively, “appellants”) have minor children who reside within the *959 Blytheville School District # 5 (“District”). The appellants applied to transfer their children from the District to neighboring school districts, but the District’s Board of Directors subsequently adopted a resolution to exempt the District from the 2013 Act under § 6 — 18—1906(b) on the basis that the District “is subject to a desegregation order or mandate of a federal court of [sic] agency remedying the effects of past racial segregation.” The appellants brought suit against the District, alleging that the District violated their constitutional rights when it resolved, for the 2013-2014 school year, to opt out under § 6 — 18—1906(b) of the 2013 Act. They sued for violations of their due process and equal protection rights under 42 U.S.C. § 1983 and for violations of the Arkansas Civil Rights Act (ACRA). As relief, the appellants requested a declaration and permanent injunction against the District, as well as damages allegedly stemming from their due process claims. The appellants also sought punitive damages for the District’s allegedly race-based . conduct. The appellants moved for partial summary judgment, and the District filed a counter-motion for summary judgment. The district court[2] denied the appellants’ motion for partial summary judgment but granted the District’s counter-motion for summary judgment. The court denied the appellants’ request for a declaration, permanent injunction, and damages. On appeal, the appellants argue that the district court erred in granting summary judgment to the District because the undisputed facts show that the District (1) violated due process by abusing its power under state law and failing to provide pre-deprivation process, and (2) violated equal protection by using race as the reason for its exemption and nullifying the 2013 Act within its borders on the pretense that it was subject to a desegregation order. We affirm.
I. Background
A. Statutory Background
Despite containing a “broad school choice transfer option,” Teague, 720 F.3d at 976, the 2013 Act also enabled certain resident school districts to restrict or defeat a student’s ability to transfer to a nonresident district. See Ark.Code Ann. § 6-18-1906(a)-(b) (2013). One of those limitations set forth an exemption for a qualifying school district, providing:
(b) (1) A school district annually may declare an exemption under this section if the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation.
(2)(A) An exemption declared by a board of directors under this subsection is irrevocable for one (1) year from the date the school district notifies the Department of Education of the declaration of exemption.
(B) After each year of exemption, the board of directors may elect to participate in public school choice under this section if the school district’s participation does not conflict with the school district’s federal court-ordered desegregation program.
(3) A school district shall notify the department by April 1 if in the next school year the school district intends to:
(A) Declare an exemption under this section; or
*960 (B) Resume participation after a period of exemption.
Id. § 6 — 18—1906(b).
The General Assembly’s intent was “that the 2013 Act would be effective on the date of its approval by the Governor.” Teague, 720 F.3d at 975-76. It specifically stated its intent to dispel any “ ‘uncertainty about the viability of [existing] transfers and future transfers’ ” and that the 2013 Act was “ ‘immediately necessary to resolve the uncertainty in the law before the 2013-2011 school year and preserve existing student transfers.’ ” Id. at 976 (emphasis added) (quoting Act 1227, 2013 Ark. Acts .1227, § 7 (Apr. 16, 2013)). But the General Assembly enacted the 2013 Act on April 16, 2013-15 days past the April 1 deadline to declare an exemption as provided in § 6-181-906(b)(3). As a result, on May 1, 2013, the Arkansas Department of Education (ADE)[3] released a memo that stated:
As noted above, Act 1227 did not become effective until April 16, 2013. However, the [2013] Act sets April 1 as the date by which a school district must notify the ADE of its intention to declare an exemption for participation in public school choice under the [2013] Act. The ADE will not attempt to reestablish a deadline that is set in law. However, so school districts and the ADE can properly administer all aspects of Act 1227 in an orderly fashion and so that parents, students, patrons and school district leaders may be aware of those school districts which are subject to desegregation orders or federal agency mandates remedying the effects of past racial segregation, the ADE requests that school districts notify the ADE of any exemption by Friday, May 17, 2013.... Contemporaneous with notice to the ADE, the ADE also requests that school districts notify the superintendents of each of their geographically contiguous school districts of the exemption. Please note that Act 1227 does not provide the ADE the authority to rule a particular exemption valid or invalid. However, the Act does allow for such exemptions if “the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation.” The ADE will post a list of school districts that declare an exemption on its website.
The 2013 Act also provided that the parents of students seeking to transfer to attend a school in a nonresident district had to submit an application to the nonresident district with a copy to the resident district on a form approved by the ADE and postmarked no later than June 1 of the year in which the student sought to begin the fall semester at the nonresident district. Ark.Code Ann. § 6-18-1905(a) (2013). By August 1 of the school year in which the student sought enrollment in a nonresident district, the superintendent of the nonresident district had to notify the parent and the resident district in writing as to whether the student’s application had been accepted or rejected. Id. § 6-18-1905(b)(1). If the nonresident district accepted the application, then the notification letter had to include the deadline by which the student had to enroll in the nonresident district, after which the acceptance was null, and instructions for the renewal procedure that the nonresident district established. Id. § 6~18-1905(b)(3). If the nonresident district rejected the application, then the notification letter had to state the reason for the rejection. Id. § 6-18-1905(b)(2).
*961 Students whose applications for transfer were rejected by the nonresident district could request a hearing before the Arkansas State Board of Education (“Board of Education”) to reconsider the transfer. Id. § 6-18-1907(b)(l). The 2013 Act required that a student request in writing an appeal hearing within ten days after the student or student’s parent received the notification letter. Id. § 6-18-1907(b)(2)(A). “As part of the review process, the parent may submit supporting documentation that the transfer would be in the best educational, social, or psychological interest of the student.” Id. § 6-18-1907(b)(2)(B). The Board of Education could overturn the nonresident district’s decision on appeal; if it did so, then it had to notify “the parent, the nonresident district, and the resident district of the basis for the state board’s decision.” Id. § 6-18-1907(b)(3). •
B. Factual and Procedural Background
As of April 29, 2013, appellants Heath and Lori Adkisson, Ryan and Melissa Braswéll, Oliver and Tracy Coppedge, George and Stephanie Hale, and Jeff and Missy Langston were residents of and had children who resided in the District. Between April 19, 2013, and April 26, 2013, each appellant submitted an application on behalf of one of their children for transfer from the District to a nonresident district under the 2013 Act for the school year beginning in fall of 2013. Each child for whom a transfer was sought is Caucasian. The District received the appellants’ applications between April 22, 2013, and April 26, 2013.
On April 29, 2013, the District met in a special session after notifying the press under the Arkansas Freedom of Information Act open-meetings law. According to the appellants, the District did not notify them of the special session. At that special meeting, the District’s Board of Education adopted a resolution by a vote of six to zero to declare the District exempt under the 2013 Act. Richard Atwill, superintendent of the District, informed the ADE of the resolution and exemption by letter dated May 9, 2013, received by the ADE on May 14, 2013.[4]
The District declared the exemption in April 2013 based in part on Franklin v. Board of Education of Blytheville School District No. 5, U.S.D.C. No. J-71-C-35 (E.D. Ark.). The history of the Franklin litigation begins on July 19, 1968, when the Regional Director of the Office of Civil Rights at the United States Department of Health, Education, and Welfare (HEW) sent a letter to the District approving the district’s “plan for the complete elimination of the dual school system in the Blytheville Public Schools.”
According to the District’s plan, the “District was to be completely desegregated by the beginning of the 1970-71 school year.” But the HEW’s onsite audit of the District
on October 6, 1970, revealed that [the District’s] commitment to a desegregated system had not been implemented in that the Robinson and Franklin Elementary Schools remained] identifiably Negro schools. Under the freedom of choice plan which [was] still in [the District’s] elementary schools, there [were] no white students in either of these schools.
Based on the audit, the Director of the Office for Civil Rights of the HEW sent a letter to the District on February 11, 1971, confirming that “because of the failure of the [District] to convert to a unitary school system the matter was being referred to [the Department of Justice (DOJ) ] with a recommendation that appropriate enforce *962 ment action be initiated.” On May 12, 1971, the District requested “a one-year continuance of the present freedom of choice plan of school desegregation for the elementary schools in the [District].”
On June 18, 1971, the DOJ denied the District’s request, stating that the DOJ was “unable to approve the [District’s continued operation under a freedom of choice plan of school desegregation.” According to the DOJ, six elementary schools within the District contained five racially identifiable white or black schools. It explained that school desegregation could not be delayed because of “possible community opposition to a change in the elementary school structure.” The DOJ gave the District ten days within which to advise the DOJ of “what plans the Blytheville School Board has taken and what procedures have been adopted to [e]nsure that such plans will be implemented at the beginning of the 1971-72 school year, for full conversion of the [District] to a unitary non-racial system.” The DOJ expressed its “hope that the Blytheville School Board w[ould] not delay in [its] obligation to convert to a unitary system and that compliance c[ould] be brought about by voluntary means rather than by resort to the coercion of the courts.”
Nonetheless, litigation ensued, as African-American parents filed suit on July 7, 1971, against the District seeking to enjoin the District from continuing to operate a dual school system and to require it to implement a unitary school system. See Franklin, U.S.D.C. No. J-71-C-35. On August 19, 1971, the district court in Franklin entered an order approving the District’s desegregation plan, with the exception of certain identified issues, ending its “freedom of choice” plan that was previously rejected by the HEW and the DOJ.
On May 31, 1973, the HEW sent a letter to the ADE advising that the HEW had reviewed the district court’s desegregation order, as well as the District’s assurance of compliance with that order, and determined that “[t]he documents [were] adequate” to satisfy Title VI requirements “for the purpose of approving applications and plans for continued participation in Federal programs.” But the HEW made clear that it had not considered the merits of the District’s desegregation plan and advised that,
[i]n an appropriate proceeding, either the Government or a private party may seek modifications of the desegregation plan or take other action as it may deem necessary. The school district must modify its plan as ordered by the court to remain in compliance. Your office and the school board are requested to keep the Office for Civil Rights informed of any appeals from or modification of the court order.
On June 21, 1973, the district court entered an order closing the case but retaining jurisdiction. The district court stated in this order that,
[o]n the basis of correspondence with counsel for the parties, the Court concludes that issues reserved in the Court’s order [approving the District’s desegregation plan] are no longer a subject of controversy. There being no pending issues in this preceding, it is ordered that this case be, and it is hereby, closed but that the Court retain jurisdiction of this cause and of the parties hereto for necessary and appropriate purposes.
On December 6, 1978, the district court entered an order dismissing the case because, since closing it, “the Court ha[d] received no further communication concerning this case.” Three days later, on December 9, 1978, plaintiffs’ counsel sent the district court a letter that stated:
The Court sua[ ]sponte closed this case. I am writing to remind the Court that *963 there is no finding by the Court that a unitary school system has been achieved, and there is no order requiring the school district to hereafter maintain an integrated system in all respects. Finally, the Court did not award the prevailing parties appropriate costs and counsel fees.
With respect to the establishment of a unitary school system, I think the obligation of the Court is to make some further inquiry and to also [e]nsure that faculty and staff desegregation principles are clearly expressed.
I am bringing these matters to the Court’s attention in the hope that the Court will rescind its order and judgment filed December 7 and substitute an order requiring the defendants to provide the Court something in the nature of a comprehensive final report which relates to students, staff, programs and facilities.
The district court in Franklin took no further action.
The appellants filed this action on May 20, 2013, alleging that the District violated their constitutional rights when it resolved, for the 2013-2014 school year, to opt out under § 6 — 18—1906(b) of the 2013 Act. They sued for violations of their due process and equal protection rights under 42 U.S.C. § 1983 and for violations of the ACRA. As relief, the appellants requested a declaration and permanent injunction against the District, as well as damages allegedly stemming from their due process claims and punitive damages for the District’s allegedly race-based conduct.
The appellants also sought a preliminary injunction requiring the District to rescind its resolution declaring the exemption for the 2013-2014 school year under the 2013 Act. The district court denied the preliminary injunction, and the appellants appealed. We dismissed the appeal as moot given the “clear terms of the motion,” which provided that the motion pertained to the 2013-2014 school year. Stevenson, 762 F.3d at 770.
Thereafter, the appellants moved for partial summary judgment on their claims, and the District moved for summary judgment on all claims. The district court denied the appellants’ motion for partial summary judgment but granted the District’s counter-motion for summary judgment. The court denied the appellants’ request for a declaration, permanent injunction, and damages.
II. Discussion
On appeal, the appellants argue that the district court erred in granting summary judgment to the District because the undisputed facts show that the District (1) violated their due process rights by abusing its power under state law and failing to provide pre-deprivation process, and (2) violated their equal protection rights by using race as the reason for its exemption and nullifying the 2013 Act within its borders on the pretense that it was subject to a desegregation order.[5]
*964 A. Mootness
As a preliminary matter, we must address whether the current appeal is moot in light of recent events. Prior to oral argument, the Arkansas General Assembly passed Act 560, which became law on March 20, 2015. The statute amends the 2013 Act, striking former § 6 — 18—1906(b), the section at issue in this appeal, and adding § 6-13-113, which provides:
(a) By January 1, 2016, a school district that is subject to a desegregation order or desegregation-related order shall notify the Department of Education in writing.
(b) A school district that is subject to a desegregation order or a desegregation-related order shall include in the written notice to the department:
(1) A copy of the desegregation order or desegregation-related order;
(2) The case heading and case number of each court case in which the order was entered;
(3) The name and location of each court that maintains jurisdiction over the order; and
(4) A description of the school choice student transfer desegregation obligations, if any, that the school district is subject to, related to the order.
(c) A school district that is released from court supervision related to a desegregation order or desegregation-related. order shall promptly notify the department.
(d) A school district that fails to meet the requirements of this section is in violation of the Standards for Accreditation of Arkansas Public Schools and School Districts.
(e) The department shall post on the department’s website all written notifications received as required by this section:
Ark.Code Ann. § 6-13-113 (2015).
Following oral argument, on April 22, 2015, the District sent a letter to the ADE claiming the exemption under § 6-13-113, explaining that it
is a party to the following desegregation lawsuits that are still active: mandates issued in 1971 by the U.S. Department of Justice and the U.S. Department of Health, Education and Welfare; Franklin, et al. v. Blytheville School District No. 5, U.S.D.C. No. J-71-C-35; and Harvell, et al. v. Blytheville School District et al., U.S.D.C. No. J-C-89-225, 126 F.3d 1038 (8th Cir.1997). The desegregation obligations of these cases prohibit the District from taking any action, or refraining from taking any action, the natural and probable consequence of which would be a segregative impact within the District (i.e., the creation, maintaining, or increasing of racially identifiable schools). Permitting school choice under the Acts would have such an impact. Allowing school choice would, therefore, be in conflict with the District’s desegregation obligation still outstanding. The District further relies upon Ark.Code Ann. § 6-18-317(a), which prohibits transfers if either the resident or residing district has ever been under a desegregation-related court order. See Edgerson on behalf of Edgerson v. Clinton, 86 F.3d 833 (8th Cir.1996).
“[Cjourts distinguish between claims seeking declaratory and injunctive relief, which may be mooted by the repeal of a statute, and claims seeking monetary relief, which generally are not mooted.” Tini Bikinis-Saginaw, LLC v. Saginaw Charter Tp., 836 F.Supp.2d 504, 520 (E.D.Mich.2011). “ We can neither declare unconstitutional nor enjoin the en *965 forcement of a provision that is no longer in effect.’ ” Id. (quoting Brandywine, Inc. v. City of Richmond, 359 F.3d 830, 836 (6th Cir.2004)). But “plaintiffs’ claim for money damages [is] not moot” where “the plaintiffs could seek damages” caused by a statutory violation. Id. (citing Brandy-wine, 359 F.3d at 836 (“Plaintiffs’ claim for monetary damages, however, was not properly dismissed as moot, because an award of monetary damages would compensate plaintiffs for the loss of the opportunity to engage in protected expression caused by the enforcement of the zoning scheme.”)).
Given that the Arkansas General Assembly has amended the 2013 Act, striking § 6—18—1906(b), and that the District has claimed an exemption under the newly added § 6-13-113, the appellants’ request for declaratory and injunctive relief as it pertains to the 2013 Act is moot. But the appellants could potentially recover money damages for any constitutional violation arising from the District’s alleged violation of the 2013 Act; therefore, the money-damages claims are not moot; accordingly, we address the appellants’ underlying due process and equal protection claims.
B. Constitutional Claims
“We review the district court’s grant of summary judgment de novo, viewing the record in the light most favorable to [the appellants] and drawing all reasonable inferences in [their] favor.” Montgomery v. City of Ames, 749 F.3d 689, 694 (8th Cir. 2014) (citation omitted).
The appellants’ due process and equal protection claims are premised on the District’s purported taking of the exemption in violation of the 2013 Act. But “violations of state laws ... do not by themselves state a claim under 42 U.S.C. § 1983. Section 1983 guards and vindicates federal rights alone.” Ebmeier v. Stump, 70 F.3d 1012, 1013 (8th Cir.1995); see also Williams v. Hopkins, 130 F.3d 333, 337 (8th Cir.1997) (“Ordinarily, an alleged violation of state law does not by itself state a claim redressable by a § 1983 action.”).
It is established beyond peradventure that a state actor’s failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim. Although it is true that constitutional significance may attach to certain interests created by state law, not every transgression of state law does double duty as a constitutional violation.
Ebmeier, 70 F.3d at 1013 (quotation, citation, and footnote omitted).
“We must be extremely careful in examining claimed violations of state laws.... Only in very limited and obvious circumstances will federal constitutional significance attach in these matters.” Whisman Through Whisman v. Rinehart, 119 F.3d 1303, 1312 (8th Cir.1997). Therefore, we now examine whether the District’s purported violation of the 2013 Act violates the appellants’ due process or equal protection rights.
1. Due Process
The Due Process Clause of the Fourteenth Amendment provides, in relevant part, that no state shall “deprive any person of life, liberty, or property, without due process of law.” U.S. Const, amend. XIV, § 1. “This clause has two components: the procedural due process and the substantive due process components.” Singleton v. Cecil, 176 F.3d 419, 424 (8th Cir.1999) (en banc) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Here, the appellants proceed only on their procedural due process claim.
To make out a claim for a violation of procedural due process, the plaintiff has *966 the burden of showing that “(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest.”
EJS Props., LLC v. City of Toledo, 698 F.3d 845, 855 (6th Cir.2012) (footnote omitted) (quoting Women’s Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir.2006)).
a. Liberty Interest
The appellants first argue that they have a protected liberty interest in directing the education of their children and that they were deprived of this interest by the District’s adoption of the resolution. The district court rejected the appellants’ argument, concluding that “[t]he fundamental rights and liberties plaintiffs claim here exceed that which the Supreme Court has recognized.” The district court found no cases “holding a parent’s ability to choose where his or her child is educated within the public school system is a fundamental right or liberty.”
“In [Washington v.] Glucksberg, the Supreme Court articulated the fundamental rights protected by the Due Process Clause.” Combs v. Homer-Ctr. Sch. Dist., 540 F.3d 231, 247 (3d Cir.2008) (per curiam) (citing Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). The Supreme Court “[ijneluded in the list ... the right ‘to direct the education and upbringing of one’s children.’ ” Id. (quoting Glucksberg, 521 U.S. at 720, 117 S.Ct. 2302 (citing Meyer v. Nebraska, 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (holding state law prohibiting foreign language instruction violated the “power of parents to control the education of their own”); Pierce v. Soc’y of Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (holding state compulsory education law requiring students to attend solely public schools “unreasonably interferes with the liberty of parents ... to direct the upbringing and education of children under their control”))).
“Although [the appellants] assert the fundamental nature of their general right, it is a limited one.” Id. As the Third Circuit has recognized,
“[t]he Supreme Court has never been called upon to define the precise boundaries of a parent’s right to control a child’s upbringing and education. It is clear, however, that the right is neither absolute nor unqualified.” C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182 (3d Cir.2005). “The case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children’s education and oust the state’s authority over that subject.” Swanson [v. Guthrie Indep. Sch. Dist. No. I-L,] 135 F.3d [694,] 699 [ (10th Cir.1998) ].
Id. at 247-48 (first alteration in original) (footnote omitted).
Here, as happened in Combs, the appellants rely “on Meyer and Pierce for foundational support.” Id. at 248.
In Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, the Court held that the liberty protected by the Due Process Clause of the Fourteenth Amendment includes the right “to acquire useful knowledge, to marry, establish a home and bring up children,” Id., at 399, 43 S.Ct., at'626, and, concomitantly, the right to send one’s children to a private school that offers specialized training in that case, instruction in the German language. In Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, the Court applied “the doctrine of Meyer v. Nebraska,” Id., at 534, 45 S.Ct., at 573, to hold unconstitutional an Oregon law requiring the parent, *967 guardian, or other person having custody of a child between 8 and 16 years of age to send that child to public school on pain of criminal liability. The Court thought it “entirely plain that the (statute) unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control.” Id., at 534-535, 45 S.Ct., at 573. In Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 [ (1972) ], the Court stressed the limited scope of Pierce, pointing out that it lent “no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society” but rather “held simply that while a State may posit (educational) standards, it may not preempt the educational process by requiring children to attend public schools.” Id., at 239, 92 S.Ct., at 1545 (White, J., concurring). And in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 [ (1973) ], the Court once again stressed the “limited scope of Pierce,” Id., at 461, 93 S.Ct., at 2809, which simply “affirmed the right of private schools to exist and to operate.... ” Id., at 462, 93 S.Ct., at 2809.
Runyon v. McCrary, 427 U.S. 160, 176-77, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (alteration in original) (emphases added).
In summary, Meyer and Pierce stand for the proposition that “[t]he Fourteenth Amendment prevents a state from denying parents the right to choose private schools for their children’s education.” Pelletier v. Me. Principals’ Ass’n, 261 F.Supp.2d 10, 13 (D.Me.2003) (emphasis added) (citing Pierce, 268 U.S. at 534-35, 45 S.Ct. 571; Meyer, 262 U.S. at 399-400, 43 S.Ct. 625). Here, the District “has not restricted the [appellants’] constitutional right to educational choice. The [appellants] are free to send [their children] to public school, or to send them to ... private school, or to educate them at home. They have freely chosen [to send their children to public school].” Id. We agree with the district court that neither Meyer, Pierce, nor any other relevant precedent support the proposition that “a parent’s ability to choose where his or her child is educated within the public school system is a fundamental right or liberty.” Adkisson v. Blytheville Sch. Dist. No. 5, No. 3:13-cv-00127-KGB, 2014 WL 6819729, at *15 (E.D.Ark. Dec. 2, 2014) (emphasis added). Accordingly, the appellants have failed to prove that they have a protected liberty interest.
b. Property Interest
The appellants next argue that the 2013 Act creates a protected property interest in public school choice. According to the appellants, § 6 — 18—1906(b) set forth limits on the District’s ability to claim an exemption and those limits were part of their property interest. They contend that the District denied them this “state-defined property interest by defying the April 1 deadline and claiming the exemption based on a case to which [the District] has not been subject for more than 35 years.”
To have a constitutionally cognizable property interest in a right or a benefit, a person must have “a legitimate claim of entitlement to it.” See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Due Process Clause does not create any property interest; it merely protects property rights arising “from an independent source such as state law.” Id. A property interest arises when state law creates “expectations that are ‘justifiable.’ ” O’Bannon v. Town Ct. Nursing Ctr., 447 U.S. 773, 796, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (quoting Vitek v. Jones, 445 U.S. *968 480, 489, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). No property interest arises where the statutory claim to a benefit is “too ephemeral and insubstantial.” Id. (quoting Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)) (internal quotation marks omitted).
Austell v. Sprenger, 690 F.3d 929, 935 (8th Cir.2012); see also Batra v. Bd. of Regents of Univ. of Neb., 79 F.3d 717, 720 (8th Cir.1996) (“For a property interest to arise, a government employee must have a ‘legitimate claim of entitlement’ to continued employment, as opposed to a mere subjective expectancy.” (quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701)).
Although a state “may not be constitutionally obligated to establish and maintain a public school system,” once it has done so, “the State is constrained to recognize a student’s legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause.” Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Goss involved the interference with students’ legitimate entitlement to a public education resulting from the students’ suspension. Id. at 579, 95 S.Ct. 729 (“At the very minimum, ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing”). The Court characterized the students’ interest as “avoiding] unfair or mistaken exclusion from the educational process.” Id.; see also id. at 581, 95 S.Ct. 729 (“The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.” (footnote omitted)). “Therefore, under Goss, the property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process.” Mazevski v. Horseheads Cent. Sch. Dist., 950 F.Supp. 69, 72 (W.D.N.Y.1997). Here, as the district court found, the appellants “have not been excluded from the educational process,” as the District has not prevented them from attending public school. Adkisson, 2014 WL 6819729, at *16.
Furthermore, we agree with the district court that “the 2013 Act does not create a property interest in exercising public school choice because plaintiffs do not have more than a mere subjective expectancy of school choice under the 2013 Act.” Id. (citation omitted). “A protected property interest is a matter of state law involving ‘a legitimate claim to entitlement as opposed to a mere subjective expectancy.’ ” Snaza v. City of Saint Paul, Minn., 548 F.3d 1178, 1182-83 (8th Cir.2008) (quoting Bituminous Materials, Inc. v. Rice Cnty., 126 F.3d 1068, 1070 (8th Cir. 1997)). “Property interests are not created by the Constitution, ‘they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....’ ” Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (alteration in original) (quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701). But “federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.” Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 757, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (quotations and citations omitted). An “entitlement” is defined as “[a]n absolute right to a ... benefit ... granted immediately upon meeting a legal requirement.” Black’s Law Dictionary 612 (9th ed.2009) (emphasis added).
Here, the 2013 Act “enable[d] a student to attend a school in a nonresident district, *969 subject to the limitations under § 6 — 18— 1906.” Ark.Code Ann. § 6-18-1903(a) (2013). It required each school district to “adopt by resolution specific standards for acceptance and rejection of applications.” Id. § 6-18-1903(d)(l). In setting forth its standards, the Act permitted school districts to “include without limitation the capacity of a program, class, grade level, or school building.” Id. § 6-18-1903(d)(2)(A). The 2013 Act required school districts to give priority to applicants with siblings or stepsiblings residing in the same household who were “already enrolled in' the nonresident district by choice.” Id. § 6-18-1903(d)(2)(B)(i)-(ii). In setting, forth standards, the 2013 Act prohibited school districts from considering an applicant’s academic achievement, athletic ability, extracurricular ability, English proficiency level, and prior disciplinary record. Id. § 6-18-1903(d)(2)(C)(i)-(iv). Nor did the 2013 Act permit school districts to discriminate “on the basis of gender, national origin, race, ethnicity, religion, or disability” in evaluating a transfer application. Id. § 6-18-1903(d)(3). The 2013 Act directed nonresident districts to notify an applicant and the resident district in writing as to whether the nonresident district had accepted or rejected the application by August 1 of the school year in which the applicant sought to enroll. Id. § 6-18-1905(b)(l). If the nonresident district rejected the application, it had to “state in the notification letter the reason for rejection.” Id. § 6-18-1905(b)(2). ■
In summary, although the 2013 Act prohibited nonresident school districts from considering certain characteristics of an applicant, it still invested the nonresident school district with the discretion to decide whether to accept a student seeking transfer. Cf. Horton v. City of Smithville, 117 Fed.Appx. 345, 347-48 (5th Cir.2004) (“[Discretionary statutes do not give rise to constitutionally-protected property interests.” (footnote omitted)). Thus, as the district court recognized, even if the District had not taken the exemption, “nonresident districts retained discretion on whether to accept students seeking to transfer.” Adkisson, 2014 WL 6819729, at *16.
In fact, the appellants concede that “[t]he 2013 Act does not guarantee that an application for transfer will be accepted.” Nevertheless, they argue that their “property interest does not hinge on the prospect of acceptance by the nonresident district” but instead “stems from their right of access to the educational process, including their right to seek other educational opportunities for them, whether within [the District] or elsewhere.” According to the appellants, the District eliminated their ability to exercise their right by illegally claiming an exemption under the 2013 Act. But the appellants’ argument misses the mark. In reviewing whether the appellants have a protected property interest, we must examine what the 2013 Act provides to the appellants. And, by its plain language, what it provides to them is the possibility of transfer to another district, not a guarantee or absolute right to transfer.
Accordingly, the appellants have failed to prove that they have a protected property interest, and their procedural due process claim necessarily fails.[6]
2. Equal Protection
The appellants argue that the District “violated equal protection by using race as the reason for its exemption and nullifying *970 the 2013 Act within its borders on the pretense that it is subject to Franklin, which is irrational and capricious.” The appellants argue that strict scrutiny applies because race clearly played a part in the District’s exemption decision. Alternatively, the appellants argue that even if race played no part in the District’s exemption decision, the District’s decision has no rational basis.
“The Equal Protection Clause of the Fourteenth Amendment commands that no state shall ‘deny to any person within its jurisdiction the equal protection of the laws,’ which is essentially a direction that all persons similarly situated should be treated alike.” City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted). Strict scrutiny applies to state action where “a State treats persons differently based on a suspect classification, such as race.” Exec. Air Taxi Corp. v. City of Bismarck, N.D., 518 F.3d 562, 566 (8th Cir.2008). But if “no suspect classification is involved, ... the State need only show that the differential treatment is rationally related to a legitimate state interest.” Id. (citation omitted).
a. Strict Scrutiny
We will review the District’s facially neutral action of claiming an exemption under the 2013 Act “under strict scrutiny only if it can be proved that the [action] was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race.” Friends of Lake View Sch. Dist. Incorp. No. 25 of Phillips Cnty. v. Beebe, 578 F.3d 753, 761 (8th Cir.2009) (quotations and citations omitted). “[Ojfficial action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.” Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (citing Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). But “an allegation of disproportionate impact ‘is only relevant to the extent that it “reflects a discriminatory purpose.” ’ ” Friends of Lake View, 578 F.3d at 761 (quoting Ricketts v. City of Columbia, 36 F.3d 775, 781 (8th Cir.1994) (quoting Davis, 426 U.S. at 239, 96 S.Ct. 2040)). “When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.” Vill. of Arlington Heights, 429 U.S. at 265-66, 97 S.Ct. 555 (footnote omitted). Only in “exceeding rare cases” will “ ‘a clear pattern, unexplainable on grounds other than race, emerge! ] from the effect of the state action even [though] the governing [action] appears neutral on its face.’ ” Friends of Lake View, 578 F.3d at 762 n. 12 (second alteration in original) (quoting Vill. of Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555).
The appellants first argue that they have provided direct evidence of racial discrimination to justify use of strict scrutiny and a consequent finding of an equal-protection violation. In support of their argument, the appellants cite the testimony of the District’s superintendent at the hearing on the appellants’ motion for preliminary injunction. At that hearing, the superintendent explained that he recommended that the District opt out of the 2013 Act based on his “opinion that the district was still part of a desegregation order.” When asked how he formed that opinion, the superintendent responded, “By looking back over some archival data that we have in the district from past cases and from some law history,” which included the Franklin case. The superintendent testified that he reviewed this “archival information” in 2013 and 2012. When asked why he reviewed the information “in 2012,” the superintendent replied:
*971 In the past, the State of Arkansas had school choice, but due to the desegregation order, white students — we couldn’t upset the racial balance. As the old law was, we couldn’t upset the racial balance of the school district, therefore, white students were not allowed to transfer out and black students were not allowed to transfer in. Black students could transfer out, white students could transfer in, but — so I tried to keep up on the information from the past to watch the trends.
(Emphases added.)
We conclude that the superintendent’s testimony is not direct evidence of racial animus. We agree with the district court that “the superintendent was speaking to the manner in which the previous school choice statute was worded and how it was implemented, not the requirements of Franklin or the 2013 Act.” Adkisson, 2014 WL 6819729, at *8 (quotation and citation omitted).
The appellants next argue that they presented evidence of disparate impact and purpose based on race. This evidence relates to the Board of Education’s approval in 2009 of an open-enrollment charter school — KIPP Delta Academy (KIPP). KIPP educates about 250 students, most of whom come from the District and the majority of whom are African American or other minorities. KIPP must admit all applicants who apply, unless there are more applicants than spaces, in which case KIPP must fill spaces according to a random, anonymous lottery.
Arkansas Code Annotated § 6-23-106 provides:
(a)The applicants for a public charter school, the local school district board of directors for the district in which a proposed public charter school would be located, and the [Board of Education] shall carefully review the potential impact of an application for a public charter school on the efforts of a public school district or public school districts to comply with court orders and statutory obligations to create and maintain a unitary system of desegregated public schools.
(b) The [Board of Education] shall attempt to measure the likely impact of a proposed public charter school on the efforts of public school districts to achieve and maintain a unitary system.
(c) The [Board of Education] shall not approve any public charter school under this chapter or any other act or any combination of acts that hampers, delays, or in any manner negatively affects the desegregation efforts of a public school district or public school districts in this state.
(Emphases added.)
The appellants, argue that despite § 6-23-106(a) and the District’s admitted review of “the KIPP Delta applications to operate and expand in Blytheville,” the District “did not claim interference with desegregation efforts when black students transferred out to KIPP Delta’s campus in Blytheville.” According to the appellants, “most of the 250 students who transferred into KIPP Delta in Blytheville came from [the District],” and “[t]he overwhelming majority of children at KIPP Delta in Blytheville are black.”
We first note that the approval of KIPP occurred “under laws different than those being discussed here.” Stevenson v. Blytheville Sch. Dist. No. 5, 955 F.Supp.2d 955, 968 (E.D.Ark.2013). Although the District was .one of the parties with the responsibility of “reviewing] the potential impact of an application for a public charter school on the efforts of a public school district or public school districts to comply with court orders,” Ark.Code Ann. § 6-23-106(a), it was the Board of Education that ultimately approved KIPP, id. § 6-23- *972 106(c). At the preliminary-injunction stage, the District’s superintendent “testified that the Blytheville District’s involvement in the charter school review process is different than the Blytheville District’s involvement in implementing the 2013 Act.” Stevenson, 955 F.Supp.2d at 968-69. Neither at the preliminary-injunction stage or now have the appellants presented any evidence to contradict the superintendent’s statement. Id. (“Plaintiffs presented no testimony or evidence to the contrary.”).[7]
Furthermore, the undisputed fact is that the District did not attempt to block any transfers of any children, regardless of race, to KIPP on the basis of any alleged desegregation order or remedy, such as Franklin. Thus, as the district court observed, “[a]ll [District] students, regardless of race, had an equal opportunity to transfer to KIPP, just as no [District] students could transfer under the 2013 Act.”' Adkisson, 2014 WL 6819729, at *6 (emphases added). As the district court observed, the appellants have presented no record evidence that the District “permitted African American but not Caucasian students to transfer out of the district.” Id. (citation omitted). Thus, this is not a case in which the District was “distributing] burdens or benefits on the basis of individual racial classifications.” Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). We agree with the district court that the District’s adoption of “the resolution exempting itself from the 2013 Act impacted Caucasian and African American students alike.” Adkisson, 2014 WL 6819729, at *7.
As a result, we, like the district court, conclude that the appellants have failed to prove a disparate purpose in claiming the exemption and that strict scrutiny does not apply. Therefore, we necessarily address the appellants’ alternative rational-basis argument.
b. Rational Basis
Under rational basis, the appellants “must prove [that they] w[ere] treated differently by the [District] than similarly situated persons and the different treatment was not rationally related to a legitimate government objective.” Koscielski v. City of Minneapolis, 435 F.3d 898, 901 (8th Cir.2006) (emphases added) (citations omitted); see also Flowers v. City of Minneapolis, 558 F.3d 794, 798 (8th Cir.2009) (“To establish a violation of the Equal Protection Clause ..., [the plaintiff] must show that he was treated differently than other persons who were ‘in all relevant respects similarly situated.’ ” (citation omitted)). “To demonstrate this, [the appellants] must prove similarity to other individuals ... receiving favorable treatment" Koscielski, 435 F.3d at 901 (emphasis added) (citations omitted).
The appellants argue that the District treated them differently because it allowed intra-district transfers to KIPP but denied the appellants inter-district *973 transfers under the 2013 Act. But, as explained supra, “[a]ll [District] students, regardless of race, had an equal opportunity to transfer to KIPP, just as no [District] students could transfer under the 2013 Act.” Adkisson, 2014 WL 6819729, at *6 (emphases added). We emphasize the lack of any evidence that the District “permitted African American but not Caucasian students to transfer out of the district.” Id. The District’s claim of the exemption equally impacted all students, regardless of race, as no student could transfer out of the District because of the District’s taking of the exemption under the 2013 Act.
Alternatively, even assuming that differential treatment exists upon which to base an equal protection claim, we conclude that the District had at least a rational basis for believing that the 2013 Act authorized it to take the exemption. First, the District could rationally believe that it submitted timely notice of the exemption in accordance with the 2013 Act. While the 2013 Act did require the District to “notify the [ADE] by April 1 if in the next school year the school district intended] to” declare an exemption, Ark.Code Ann. § 6-18-1906(b)(3), the 2013 Act did not become effective until April 16, 2013. As we recognized in Teague, the General Assembly’s intent was “that the 2013 Act would be effective on the date of its approval by the Governor.” 720 F.3d at 975-76. Because of the purported ambiguity regarding whether exemptions were available to school districts for the 2013-14 school year, the ADE “requested] that school districts notify the ADE of any exemption by Friday, May 17, 2013, so that the ADE [could] properly administer all aspects of Act 1227 in an orderly fashion.” The District declared its exemption on April 29, 2013, prior to the issuance of the ADE Memo, but the ADE Memo sets forth the rational basis upon which the District could have also believed that its taking of the exemption for the 2013-14 school year was timely.
Second, while we decline to hold as a matter of law that the District “is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation,” Ark.Code Ann. § 6-18-1906(b)(l), we do hold that the District at least had a rational basis for believing that it “is subject to the ... mandate of a federal court or agency.”[8] See id. Although the district court entered an order dismissing the Franklin case on December 6, 1978, the District “views the commands set out in the HEW letter [of May 31, 1973] as a mandate by a federal agency that it cannot return to the dual school system perpetuated by the ‘freedom of choice’ plan, which Judge Eis[e]le dismantled in 1971.” (Emphasis added.) The District argues that not taking the exemption under the 2013 Act could potentially “dismantle the mandates of’ the DOJ, HEW, and Franklin judgment “by returning North Mississippi County to a freedom of choice system, thereby resegregating the school systems.”
We conclude that the District could reasonably read the HEW’s letter as a federal-agency mandate upon the District to take no action that could result in the District returning to the dual-school system dismantled by the Franklin litigation.[9] *974 While the HEW letter specifically stated that the District at that time was “meet[ing] the requirements of Title VI ... for the purpose of approving applications and plans for continued participation in Federal programs,” it also indicated that
[i]n an appropriate proceeding, either the Government or a private party may seek modifications of the desegregation plan or take other action as it may deem necessary. The school district must modify its. plan as ordered by the court to remain in compliance. Your office and the school board are requested to keep the Office for Civil Rights informed of any appeals from or modification of the court order.
(Emphases added.)
For the aforementioned reasons, we hold that the District’s taking of the exemption under the 2013 Act survives rational-basis review. See Vasquez-Velezmoro v. United States I.N.S., 281 F.3d 693, 697 (8th Cir.2002) (“The government’s different treatment of persons will ‘be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.’ ”) (quoting FCC v. Beach Commc’n, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)),
III. Conclusion
Accordingly, we affirm the judgment of the district court.

. Portions of this introductory section are taken directly from this panel's earlier decision, Stevenson v. Blytheville Sch. Dist. No. 5, 762 F.3d 765 (8th Cir.2014), without specific attribution.

. The Honorable Kristine G. Baker, United States District Court for the Eastern District of Arkansas.

. The 2013 Act provides that the "State Board of Education may promulgate rules to implement” the 2013 Act. Ark.Code Ann. § 6 — 18— 1907 (2013).

. On March 31, 2014, the District renewed its claim of exemption under the 2013 Act.

. Having concluded that the appellants do not have a constitutionally protected liberty or property interest, we need not address the remaining elements of their procedural due process claim.

. As the district court noted in its order denying the motion for preliminary injunction:
Plaintiffs did submit a March 1, 2013, Memo to the State Board of Education from the Arkansas Department of Education staff which stated: "The Arkansas Department of Education is unaware of any pending desegregation orders or decrees affecting either [the Blytheville District or Helena — West Helena District]” (Hearing Ex. 1; Dkt. No. 19-1, at 2). Mr. Atwill testified that, based on conversations he had with a representative of the Equity Department at the Arkansas Department of Education, he disagreed with this characterization. He also questioned what information the Arkansas Department of Education reviewed before making the statement.
Stevenson, 955 F.Supp.2d at 969 (alteration in original).

. We decline to address whether the District had a rational basis for believing that it is currently "subject to [a] desegregation order.” See id.

. We, as did the district court, reject the argument that the District "was required to distinguish between intradistrict and interdistrict desegregation orders when determining whether it could adopt the resolution exempting [the District] from the 2013 Act” because the 2013 Act "does not require such an analysis or differentiate between these types of desegregation orders.” Adkisson, 2014 WL 6819729, at *14.